**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VEOLA HANKLE-SAMPLE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-1997 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| THE CITY OF CHICAGO, TINA | ) | |
| CONSOLA, JOEL FLORES, CHARLES | ) | |
| BILLOWS, & RESHMA SONI, | ) | |
| | ) | |
| Defendants. | | |

**MEMORANDUM OPINION AND ORDER**

Veola Hankle-Sample ("Plaintiff"), a former employee of the City of Chicago, worked with Charles Billows, Tina Consola, Joel Flores, and Reshma Soni. On the heels of her termination, Plaintiff brought this lawsuit [23] against the City, Billows, Consola, Flores, and Soni (collectively "Defendants") alleging various Title VII and civil rights violations. All Defendants moved to dismiss [29, 33.]

For the reasons stated below, the motion is granted in part and denied in part. In particular, the Court dismisses the City as to the § 1983 claims, Counts II, V, VI, VIII, X, and XII, without prejudice. However, the City's motion to dismiss the Title VII and ADEA claims, Counts I, III, IV, VII, IX, and XI, is denied.

As to the Individual Defendants, the Court dismisses all Individuals Defendants from the Title VII and ADEA claims, Counts I, III, IV, VII, IX, and XII, without prejudice. Furthermore, the Court dismisses Defendants Flores and Soni from the remaining claims against them, the § 1983 claims, Counts II, V, VI, VIII, X, and XII. Therefore, Flores and Soni are terminated from the First Amended Complaint without prejudice. However, the Court denies Defendants Billows' and Consola's motion to dismiss the § 1983 claims, Counts II, V, VI, VIII, X, and XII.

I.      **Background**[1]

        Plaintiff is a fifty-two-year-old African American woman.  [23 at ¶ 4.]  In May 2014,
Plaintiff began her employment with the City of Chicago's Department of Finance as the Manager
of Revenue Collection.  [*Id.* at ¶ 13.]  She was promoted to Assistant Director of Street Operations
in December 2016.  [*Id.* at ¶ 16.]  In this new role, she initially reported to the Deputy Director of
Street Operations, Bill Keenan, who is an African American male.  [*Id.* at ¶ 16.]  In January 2017,
Plaintiff received an email from Defendant Consola, the First Deputy Director, informing Plaintiff
that Plaintiff would report to Defendant Billows, "a younger, White male."   [*Id.* at ¶ 17.]
Defendant Billows was allegedly promoted to Assistant Deputy.  [*Id*.]  However, Plaintiff emailed
the Personnel Director, Doniece Stevens, "inquiring about the reporting change," and Stevens
informed Plaintiff "that she was unaware of this change and that the change was fictitious and had
not been approved."  [*Id.* at ¶¶ 18, 20.]  Keenan was also informed that this change was not
approved, but Plaintiff was nevertheless "forced to report to" Defendant Billows.  [*Id*. at ¶ 20.]

        Between 2017 and 2019, "Plaintiff made a plethora of complaints verbalizing race
discrimination and disparate treatment to several managerial agents of the Defendant."  [23 at
¶ 21.]  Specifically, she "complained that non-Black employees that hold the same title and work
in the same department were paid less than the Plaintiff and Plaintiff's Black peers, a practice
perpetuated by Defendants Consola and Soni."  [*Id.* at ¶ 22.]  In July 2018, Plaintiff filed two EEO
complaints against the City of Chicago, alleging that she was subject to different terms of
employment because of her race and that she was paid less than several similarly situated non-
Black employees.  [*Id.* at ¶ 23.]  In response to these complaints, "the Defendant engaged in a
campaign to harass Plaintiff" and "posed continuous impediment to Plaintiff's ability to perform

---

[1] The Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable
inferences in Plaintiff's favor.  *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

essential job functions." [*Id.* at ¶¶ 24–25.]

For example, Defendant Consola began sending "unprofessional, rude" emails to Plaintiff and "would bypass three levels of hierarchy to interrogate and insult Plaintiff about matters that were not in Plaintiff's job purview." [23 at ¶¶ 26–27.] Defendant Consola also claimed that Plaintiff's employees had erroneously issued 4,000 tickets when, in reality, only 70 tickets were issued in error. [*Id.* at ¶ 49.] Defendant Billows refused to communicate with Plaintiff, interact with Plaintiff, or provide Plaintiff with any instructions or training for her new position. [*Id.* at ¶ 30.] He would deliberately fail to include Plaintiff on important communications she needed to do her job. [*Id.*] Defendant Billows did interact with Plaintiff's similarly situated but white coworkers. [*Id.* at ¶ 31.] Billows also "taunted Plaintiff and told other employees that he received a promotion over Plaintiff even though he does not have any educational degrees." [*Id.* at ¶ 37.]

The Defendants excluded Plaintiff from various meetings that were directly tied to Plaintiff's job tasks, such as meetings with aldermen and meetings about new equipment. [23 at ¶¶ 33–34.]

Plaintiff "complained to Defendant's leadership numerous times about the discriminatory conduct she endured from Charles Billows." [23 at ¶ 36.] Defendants Consola and Flores "condoned Billows' behavior toward Plaintiff and failed to intervene." [*Id.* at ¶ 61.]

Prior to filing her complaints, Plaintiff never received negative comments about her work or any performance evaluations, but after she filed her complaints, she received a negative performance evaluation. [23 at ¶¶ 38–40.] She was placed on a Performance Improvement Plan (herein "Performance Improvement Plan" or "PIP") for forty-five days. [*Id.* at ¶ 41.] It was Defendants' practice to train employees that were placed on PIPs; however, Plaintiff never received any training. [*Id.* at ¶¶ 42–43.] Plaintiff's PIP also "included demerits for job tasks that

3

did not lie within Plaintiff's job purview." [*Id.* at ¶ 45.] This PIP process was "significantly different than the process Defendants conducted with similarly situated White employees." [*Id.* at ¶ 47.] After filing her complaints, Defendants held her to "different standards than her White younger, male co-workers." [*Id.* at ¶ 50.] For example, Plaintiff was given an assignment to complete a training manual, which she completed. [*Id.* at ¶ 51.] A white younger male was given the same assignment; he did not complete this and other assignments but was never disciplined and instead received a raise. [*Id.* at ¶ 52.]

Near the end of her employment, Plaintiff continued to make complaints. Specifically, on May 2, 2019, Plaintiff complained again about retaliation based on her race and gender; specifically, she complained that Defendant Billows was ignoring her request for training and information needed to complete her job. [23 at ¶ 58.] She requested a meeting with Managing Deputy Joel Flores, hoping that he would intervene as he typically met with every person in the department on request. [*Id.* at ¶ 59.] Defendant Flores "refused to meet with Plaintiff because she complained about discrimination." [*Id.*] On May 21, 2019, Plaintiff reported Defendants Billows and Consola for their personal use of the municipal vehicle fleet, and Plaintiff filed a complaint for unfair labor practices "due to Defendant's mandate that Plaintiff report to Charles Billows, a White, younger male, even though Billows held a f[i]ctitious title." [*Id.* at ¶ 55.] On June 3, 2019, Plaintiff "complained via email, citing that she was being harassed, discriminated against, and targeted because of prior protected activity." [*Id.* at ¶ 62.]

Plaintiff's work environment took a mental and physical toll on her. On May 10, 2019, Plaintiff enrolled in the Employee Assistance Program because she was overwhelmed with the harassment and began experiencing chest pains, shortness of breath, and headaches. [23 at ¶ 54.] Shortly thereafter, she was diagnosed with severe anxiety, prescribed medication for panic attacks,

and given a physician's instruction to take a leave from work. [*Id.* at ¶ 54.]

On August 16, 2019, Plaintiff was terminated and placed on the City of Chicago's "Do-Not-Rehire" list without cause or justification. [23 at ¶ 64.] Plaintiff alleges upon information and belief that her position was filled "with a White, younger male." [*Id.* at ¶ 65.] Finally, Plaintiff alleges that "Defendant has a deliberate and systemic practice of discriminating against Black Women. Plaintiff's predecessor, a Black Woman resigned because of Defendant's systemic, discriminatory practices." [*Id.* at ¶ 66.] Plaintiff also alleged that, "[u]pon information and belief, the Defendant promotes inexperienced White males with no education beyond high school over well-qualified, Black Women." [*Id.* at ¶ 67.]

Plaintiff then filed this twelve-count complaint [23] alleging: (I) Title VII race discrimination, (II) § 1983 race discrimination, (III) Title VII harassment (race), (IV) Title VII harassment (retaliation), (V) § 1983 harassment (race), (VI) § 1983 harassment (retaliation), (VII) Title VII retaliatory discharge, (VIII) § 1983 retaliatory discharge, (IX) Title VII age discrimination, (X) § 1983 age discrimination, (XI) Title VII sex/gender discrimination, (XII) § 1983 sex/gender discrimination. Defendants moved to dismiss [29, 33.]

## II.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint typically must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Twombly*, 550 U.S at 555). In determining whether the complaint meets this standard, the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *Killingsworth*, 507 F.3d at 618.

## III.   Analysis

Plaintiff's First Amended Complaint contains twelve claims related to racial discrimination and retaliation, as well as age and sex discrimination that she alleges she experienced during her employment with the City of Chicago. The City and Individual Defendants have each moved to dismiss the entire complaint pursuant to Rule 12(b)(6). Although the City has stylized its motion as a motion to dismiss under Rule 12(b)(6), it also includes affirmative defenses as to which the City's motion is more properly characterized as a motion for judgment on the pleadings under Rule 12(c). For ease of reading, the Court will address the Title VII and Age Discrimination in Employment Act ("ADEA") claims (Counts I, III, IV, VII, IX, and XI), then the § 1983 claims (Counts II, V, VI, VIII, X, and XII).

### A.   Title VII Claims (Counts I, III, IV, VII, IX and XI)

The Court begins with the Defendants' motions to dismiss the Title VII and ADEA claims entirely (Counts I, III, IV, VII, IX and XI). The Individual Defendants seek dismissal because neither statute imposes individual or supervisory liability. The City Defendants advance several arguments, chief among them that Plaintiff has neither alleged a "materially adverse" employment action to predicate her various claims nor exhausted her administrative remedies on certain others. The Court will begin by explaining why the Individual Defendants are dismissed from Counts I, III, IV, VII, IX and XI. Then, it will address why Counts I, III, IV, VII, IX, and XI state a claim for relief against the City and thus dismissal under Rule 12(b)(6) is improper as to those Counts.

### 1. Individual Defendants

Defendants Billows, Consola, Flores, and Soni argue that Title VII does not impose individual or supervisor liability, and only an "employer" meeting the statutory definition can properly be sued. See 42 U.S.C. § 2000e(b) (defining "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees * * * and any agent of such a person."); 29 U.S.C. § 630(b) (same). The Court agrees. None of the individual Defendants are employers, and Plaintiff raises no argument to the contrary. *Lee v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 912 F.3d 1049, 1053–54 (7th Cir. 2019) ("[E]ven a complaint that passes muster under the liberal notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2) can be subject to dismissal if a plaintiff does not provide argument in support of the legal adequacy of the complaint."). As the Seventh Circuit explained in *Williams v. Banning*, 72 F.3d 552, 555 (7th Cir. 1995), so long as "a supervisor does not, in his individual capacity, fall within Title VII's definition of employer, [a plaintiff] can state no set of facts which would enable her to recover under the statute." Accordingly, Plaintiff cannot sue any of the Individual Defendants under Title VII or the ADEA. The Court therefore dismisses the Individual Defendants, Billows, Consola, Flores, and Soni from all of Plaintiff's Title VII and ADEA claims (Counts I, III, IV, VII, IX and XI).

### 2. City Defendant

The Court turns now to the more complex issues raised by the City's request to dismiss Counts I, III, IV, VII, IX and XI on the ground that these Title VII and/or ADEA claims do not state a claim upon which relief could be granted or otherwise have not been exhausted. The Court will address the Plaintiff's claims thematically, proceeding as follows: First, it will address the Title VII race discrimination claims (Counts I and III); second, it will reach the Title VII sex- and age-discrimination claims (Counts IX and XI); third, it will address the Title VII retaliatory

harassment and discharge claims (Counts IV and VII). Although the City furnishes multiple reasons to dismiss each claim, the Court will address only the arguments that impact its analysis.

### a.    Title VII Race Discrimination (Counts I and III)

The City argues that Plaintiff's Title VII race discrimination claims (Counts I and III) should be dismissed. As to both claims, the City maintains that Plaintiff has not alleged a materially adverse action driven by race discrimination to state a claim for relief under Rule 12(b)(6). As to the discriminatory discharge claim (Count I), the City argues that Plaintiff has not exhausted her administrative remedies. The Court will address each argument in turn.

The City contends that Plaintiff's discharge and hostile-work-environment claims should be dismissed primarily on two independent bases: (1) that Plaintiff has not pled a material, adverse action, and (2) the conduct alleged was not animated by race discrimination. The pleading standard for Title VII claims is not demanding: a plaintiff "need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her" protected status. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008)). See, *e.g.*, *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1028 (7th Cir. 2013) (explaining that *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002), does not require a Title VII complaint to anticipate methods of proof used at summary judgment).

"In a discrimination case, a materially adverse employment action is one which visits upon a plaintiff 'a significant change in employment status.'" *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). Title VII proscribes not only "economic" or "tangible" discrimination, but also "requiring people to work in a discriminatorily hostile or abusive environment." *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017) (internal quotation marks omitted) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)).

8

Here, the discriminatory discharge (Count I) clearly constitutes a materially adverse employment action to state a claim for relief. *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000) ("For an employment action to be actionable, it must be a 'significant change in employment status, such as hiring * * * or a decision causing a significant change in benefits.'" (citation omitted)).

Shifting to the hostile work environment claim (Count III), a Plaintiff states a claim under Title VII if she alleges the following four prongs: "(1) [s]he 'was subject to unwelcome harassment'; (2) 'the harassment was based on [her] [protected trait]'; (3) 'the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment'; and (4) 'there is basis for employer liability.'" *Id.* at 549 (quoting *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833–34 (7th Cir. 2015)).

The third prong, severe or pervasive harassment, is designed to assess whether the workplace is objectively hostile to a reasonable person. We ask whether the environment is "so pervaded by discrimination that the terms and conditions of employment are altered." *Alamo*, 864 F.3d at 550 (quoting *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013)). In answering that question, "we consider the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," together with the "specific circumstances of the working environment and the relationship between the harassing party and the harassed." *Id.* at 549–50 (first quoting *Harris*, 510 U.S. at 23; and then quoting *Robinson v. Sappington*, 351 F.3d 317, 330 (7th Cir. 2003)). Our context-specific task is designed to strike a balance between transforming Title VII into a "general

civility code" without going so far as to require allegations of a "hellish" workplace for a claim to survive. *Id.* at 550.

In this case, Plaintiff states a claim for a hostile work environment because the totality of the circumstances, if proven, indicate that her coworkers seriously undermined her job performance and contributed to her discharge. Specifically, she argues in her brief that Defendant Billows "each and every day * * * deliberately concealed information that Ms. Hankle-Sample needed to perform her essential job functions," falsified allegations about her performance, placed her on a Performance Improvement Plan, and denied her training that might have afforded her an opportunity to redeem herself once on the PIP. [40, at 17, 19.][2] In short, she alleges that her coworkers did not just engage in run-of-the-mill office antics, but rather that their conduct impeded her performance and culminated in her eventual discharge. See [29 at Ex. B] (enumerating "delegation" and "enforcement of work standards and timeliness" as among Plaintiff's "deficien[cies]" on her Performance Improvement Plan); *Tyler v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 2018 WL 5977925, at *3 (N.D. Ill. Nov. 2018) (complaint could state an actionable claim for harassment where plaintiff was repeatedly criticized, disciplined, and ultimately relocated and denied supplies needed to perform his job).

---

[2] Among other allegations, in the First Amended Complaint, Plaintiff claims that "[o]n several occasions, Billows deliberately failed to include Plaintiff on important communications that are conducive to the essential functions of Plaintiff's job." [23 at ¶ 30.] Those "actions prevented Plaintiff from managing her staff and completing essential job tasks. * * * Plaintiff pleaded with Defendant Billows to communicate with her so that she could effectively carry out her job functions." [*Id.* at ¶ 32.] She further alleges that her coworkers "falsified and embellished reports" for errors she did not make. [*Id.* at ¶¶ 48–49.] Plaintiff adds that "Defendants ignored Plaintiff's request for training, access to information, inclusion on communications, and meetings essential to her job functions for years." [*Id.* at ¶ 101.] She also alleges that "normal course of business" was to "train employees that are placed on PIP's" but that "Billows" from whom she was "to receive training" "refused to interact with Plaintiff." [*Id.* at ¶¶ 41–43.] Further, she alleged that the PIP "included demerits for job tasks that did not lie within Plaintiff's job purview." [*Id.* at ¶ 45.]

The City's reliance on *Dalton v. Board of Education for, Mount Vernon Township High School District 201*, 162 F. Supp. 3d 807, 812–13 (S.D. Ill. 2016), *Duminie v. Northeast Illinois Regional Commuter Railroad Corp.*, 2020 WL 1288876, at *6 (N.D. Ill. Mar. 18, 2020), and *Adam v. Obama for America*, 210 F. Supp 3d 979, 990–91 (N.D. Ill. 2016), is misplaced because Plaintiff alleges that the workplace conditions seriously affected her career prospects. In *Dalton*, the court dismissed a hostile work environment claim because, among others, the employee's allegations that she was denied training did not alter her job prospects or advancement. 162 F. Supp. 3d at 812–13. Here, the totality of the circumstances, including Plaintiff's performance record predating the complaints, her coworkers' fabrication of errors, interference with important files, disregard for "Plaintiff's request for training, access to information, inclusion on communications, and meetings essential to her job functions for years," and denial of training designed to redeem her performance following the Performance Improvement Plan, suggest the conduct altered her performance. See [23 at ¶¶ 39, 41, 43; 48–49, 101, 121.] In short, and unlike the *Dalton* plaintiff, Plaintiff points to ways that her colleagues' behavior "'tend[ed] to affect' [her] employment status or benefits [and] cause[d] 'material harm' to [her] opportunities for growth or advancement." See *Dalton*, 162 F. Supp. 3d at 813.

*Duminie* and *Adam* are inapposite as well. Plaintiff alleges that coworker conduct seriously affected her job prospects. In both cases cited by the City, the plaintiffs did not allege that their coworkers' "slights," including failure to collaborate and train negatively, impacted job performance nor culminated in discharge. See *Duminie*, 2020 WL 1288876 at *2, *7; *Adam*, 210 F. Supp. 3d at 983–84. In contrast here, "the totality of the circumstances," *Alamo*, 864 F.3d at 550, includes Plaintiff's allegations that Billows' conduct recurred, spanned at least two years,

and prevented her from "perform[ing] essential, day-to-day job functions"—all of which plausibly could have contributed to disciplinary measures. [See 23 at ¶¶ 24, 30, 60.]

In addition to its argument that Plaintiff has not alleged a materially adverse action, the City submits that Plaintiff has not alleged that her coworkers were motivated by a discriminatory purpose. It is true that "there must be some connection to [the protected characteristic], for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to [the protected class]." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016). However, the City's arguments fail for two reasons. First, Plaintiff includes several allegations that employees outside of the protected class were not subjected to similar treatment: Plaintiff alleges that she was not afforded the same opportunities white employees were to succeed on her PIP. [See 23 at ¶ 47.][3] She also alleges that similarly situated employees were held "to different standards than her White younger, male, co-workers," for example receiving promotions despite failure to complete the same assignments. [*Id.* at ¶¶ 50–52.] While these allegations are not particularly robust in their details, "the complaint * * * clearly connects this treatment to [Plaintiff]'s protected status" which "is sufficient at the 12(b)(6) stage." See *Alamo*, 864 F.3d at 554 (holding plaintiff stated a claim because"[t]he complaint also clearly connects this treatment to Mr. Alamo's protected status, claiming that "other, non-Latino firefighters have not been subjected" to these types of "hurdles, obstacles, and challenges in their attempts to return to work after a medical leave of absence."); *Watkins v. City of Chicago*, 2018 WL 2689537, at *6 (N.D. Ill. 2018) (Plaintiff's allegation that she was suspended and white or

---

[3] Specifically, Plaintiff alleges that in her own experience, "Plaintiff witnessed numerous PIP procedures with numerous other employees. The PIP process that the Defendants conducted with the Plaintiff was significantly different than the process Defendants conducted with similarly situated White employees." [23 at ¶¶ 43, 46–47]. She further alleges that "non-Black employees that hold the same title and work in the same department were paid less than the Plaintiff and Plaintiff's Black peers." [*Id.* at ¶ 22.]

male employees accused of similar misconduct were not disciplined in this manner, "although threadbare," stated a claim).

Second, the cases cited by Defendant are readily distinguishable because this is not a situation where "nothing in in Plaintiff's complaint suggest[ed] that the alleged harassment Plaintiff received had *anything* to do with her race." *Duminie*, 2020 WL 1288876, at *6 (emphasis in original). Nor is this an instance of a dearth of evidence at summary judgment, see *Dalton*, 162 F. Supp. 3d at 810, *Boss*, 816 F.3d at 920, where Plaintiff has failed to allege a single link at the "'put up or shut up' moment of litigation." *Id.*, at 813 (quoting *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)).

As a backstop, the City argues that Plaintiff did not exhaust administrative remedies on certain claims, including the discriminatory discharge. Although it frames its motion as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a failure to exhaust is an affirmative defense and thus a Rule 12(b)(6) motion—which tests the adequacy of the allegations to state a valid claim—is inapt, because plaintiffs need not plead around affirmative defenses in a complaint." *Surgit v. City of Chicago*, 2021 WL 1192674, at *2–3 (N.D. Ill. Mar. 29, 2021). As Judge Chang recently put it:

> In reality, the proper vehicle to assert lack of exhaustion (if it is to be considered at the pleading stage) is a Rule 12(c) motion for judgment on the pleadings. If discovery is not needed to resolve the exhaustion defense, and "if the allegations of the complaint [viewed] in the light most favorable to the plaintiff show that there is no way that any amendment could salvage the claim," then the Court may consider the motion at the pleading stage.

*Id.* (internal citation omitted) (quoting *Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 533 (7th Cir. 2006)).

Here, neither Plaintiff nor the City of Chicago argue that the Court should not address the exhaustion defense. Rather, Plaintiff attached two of three EEOC filings (a September 2018 and

May 2019 amended charge) to her First Amended Complaint as exhibits, and she has not otherwise contested in her brief that the Court may consider the allegations at this stage. Nevertheless, one important issue remains that is not capable of resolution at this stage. The City argues that Plaintiff has not exhausted her administrative remedies with respect to her discharge from the City. In response, Plaintiff attaches a third EEOC filing (a September 2019 second amended charge) evidencing that she did, in fact, indicate that "[i]n retaliation for filing previous complaints of discrimination, I was discharged on or about August 16, 2019." [40 at Ex. C.] In reply, the City insists that Plaintiff did not state that she *filed* the September 2019 charge with the EEOC, nor could the City confirm that she had done so. It is clear from the missing puzzle pieces that this is a far cry from a situation in which the allegations "set forth everything necessary to satisfy the affirmative defense" issues presented by the City. *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005); *Compare Surgit v. City of Chicago*, No. 1:19-CV-07630, 2021 WL 1192674, at *2–3 (N.D. Ill. Mar. 29, 2021).

In sum, Plaintiff has stated a claim for a discriminatory discharge (Count I) and hostile work environment (Count III) with a sufficient connection to racial animus. These allegations, if proven, could provide indirect evidence to satisfy the *McDonnell-Douglas* framework at the later summary judgment stage. And consideration of the City's exhaustion defense is premature given the information gap noted above.

   **b.    Title VII Sex Discrimination and ADEA Age Discrimination
          (Counts IX and XI)**

Shifting to the remaining statutory discrimination claims, the City maintains that the Plaintiff's age (Count IX) and sex discrimination (Count XI) claims should be dismissed because (1) Plaintiff fails to allege a material adverse action, (2) fails to allege a connection to discriminatory animus, and (3) fails to administratively exhaust her remedies. The first and third

arguments can be disposed of quickly, as the Court has already found that the discharge constitutes a material, adverse action for Title VII purposes and that consideration of the exhaustion defense to her discharge claim is premature.

The Court is not persuaded by the City's second basis for dismissal, that there is no alleged connection between the Defendants' conduct and sex- or age-based animus. Plaintiff sufficiently alleges that similarly situated employees outside of the protected class were treated differently. [See 23 at ¶¶ 19, 50–52, 67.][4] Those allegations are enough to put the employer on notice of the nature of these claims on the pleadings, thereby "satisfying the standard applied in *Swanson*, *Tamayo*, and *Concentra*." *Carlson*, 758 F.3d at 827. The City's arguments rest primarily on summary judgment cases, and the Seventh Circuit has cautioned courts to heed the lower burden at the pleading stage. See *id.* ("The plaintiff is not required to include allegations * * * that would establish a prima facie case of discrimination under the 'indirect' method of proof.").

Accordingly, Counts IX and XI against the City state claims upon which relief can be granted.

### c. Title VII Retaliation (Counts IV and VII)

Shifting to the Plaintiff's Title VII retaliation claims, Plaintiff alleges she was discharged (Count VII) and harassed (Count IV) in retaliation for statutorily-protected conduct—namely, filing complaints that she was discriminated against. The City maintains that both claims should be dismissed. Regarding the discharge, the City alleges there was no plausible connection between

---

[4] Specifically, she alleges that "Defendants continued to hold Plaintiff to different standards than her White younger, male, co-workers," including a colleague who received, but did not complete, the same and other assignments as Plaintiff had not been disciplined and received a salary increase. Furthermore, she alleges that "[o]n information and belief," similarly situated male, younger coworkers were promoted with performance deficiencies, citing Charles Billows' promotion as one example.

Plaintiff's complaints and her termination.  As to the harassment, the City maintains that there was no sufficiently hostile work environment to state a claim for relief.

### i.  Discharge (Count VII)

"Pleading a retaliation claim under Title VII requires the plaintiff to 'allege that she engaged in statutorily protected activity and was subjected to adverse employment action as a result.'" *Carlson*, 758 F.3d at 827 (quoting *Luevano*, 722 F.3d at 1029).  The Seventh Circuit recognizes a broad swath of protected conduct, and there is "no dispute that [the plaintiff] satisfied the first element by filing her EEOC charge." *Ajayi v. Aramark Bus. Serv., Inc.*, 336 F.3d 520, 533 (7th Cir. 2003).  Complaints to employers, including "an official complaint with an employer" may qualify, but only if the complaint states that discrimination occurred based on a protected class. *Tomanovich v. City of Indianapolis et al.*, 457 F.3d 656, 663–64 (7th Cir. 2006).

While a Plaintiff need not allege a causal connection at the pleading stage, *Luevano*, 722 F.3d at 1020, she must allege enough to make out a plausible retaliation claim. *Carlson*, 758 F.3d at 828–29.  There is "no bright-line timing rule" to guide whether a retaliation claim is plausible. *Id.* at 829.  "If the best a plaintiff can do is allege that he engaged in protected activity and then, years later, the employer took an adverse action against him, the claim may not be permitted to proceed." *Id.* at 828.  However, when a plaintiff alleges "an ongoing campaign of retaliation" or provides a plausible explanation for the lapse, even an otherwise lengthy interval may suffice to survive Rule 12(b)(6).  See *id.* at 828–29 (reversing summary dismissal of retaliation claims despite four-month gap because such "parsing of events lost sight of the bigger picture, which showed an ongoing pattern of retaliation"); *Alamo*, 864 F.3d at 555–56 (reversing Rule 12(b)(6) dismissal because plaintiff's explanation for time gap between complaint and employer's retaliatory conduct meant lapse "[could] [n]ot be used to suggest a break in the causal chain").

16

In this case, Plaintiff's allegations present a plausible connection between her multi-year, repeated effort to blow the whistle on her employer and her discharge. Specifically, during the same period as her trials on the job, in addition to the EEOC complaints in 2018 and 2019, she alleges that she filed two EEO complaints on or about July 2018, emailed complaints to her supervisors between 2017 and 2019, and (at some unspecified time) complained to the Mayor's office. [See 23 at ¶¶ 21–23, 56, 62.] In sum, in the First Amended Complaint, Plaintiff describes a "ongoing period of retaliation," *Carlson*, 758 F.3d at 828, during the very same period in which she filed internal and external whistleblower complaints. Her allegations that similarly situated employees who did not engage in protected activity were treated more favorably further reinforce the inference.[5] [23 at ¶ 43.]

The City's attempt to break the causal link fails because "this parsing of events los[es] sight of the bigger picture, which showed an ongoing pattern of retaliation." See *Carlson*, 758 F.3d at 829. At a minimum, only three months elapsed between her formal EEOC Complaint in May 2019 and discharge in August 2019. Even this lapse, however, "must be viewed through the lens" of her ongoing complaints. *Id.* Plaintiff's discharge followed on the heels of two and a half years of formal and informal complaints that she was being discriminated against on the basis of race and sex to her employer, the Mayor's office, and the EEOC. See, *e.g.*, *Vazquez v. Suncast Corp.*, 2019 WL 2576554, at *3–4 (N.D. Ill. June 24, 2019) (one month lapse following reports to HR and several threats to HR plausibly alleged her complaints caused employer retaliation); *Conner v. Bd. of Trs. for Univ. of Ill.*, 2019 WL 5179625, at *8 (N.D. Ill. Oct. 15, 2019) (temporal

---

[5] Plaintiff alleges that "other employees placed on PIPs were trained because they had not engaged in protected activity." [*Id.* at ¶ 44.] To the extent the allegation states a legal conclusion, the Court disregards the allegation that these PIPs were trained "because they had not engaged in protected activity," but otherwise notes the dissimilar treatment of persons outside the protected claim to infer a causal chain. [*Id.*]

proximity, complaints about racial discrimination multiple times over four years, differential treatment satisfied Rule 12(b)(6)).

Finally, the cases on which the City relies are readily distinguishable. Unlike the Plaintiff in *Tarpley v. City Coll. of Chi.*, 87 F. Supp. 3d 908, 913–14 (N.D. Ill. 2015), plaintiff alleges a pattern of protected conduct and complained directly to multiple supervisors, on multiple occasions concerning the discriminatory treatment. See *id.* at 913–14 (dismissing complaint for retaliatory discharge because plaintiff did not allege that the employer was aware of her single complaint to IDHR containing an allegation of race-based discrimination). *Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 665–666 (7th Cir. 2011), was decided on a motion for summary judgment. To be sure, Plaintiff could have been clearer as to which "managerial agents" she dealt with, who thus would have had knowledge of her complaints. Still, Plaintiff has sufficiently alleged that the retaliatory discharge had a connection to her complaints of discrimination.

### ii.      Hostile Work Environment (Count IV)

The City's claim that Plaintiff has failed to state a claim on Count IV can be disposed of much more easily. For the reasons discussed above, Plaintiff has stated a claim for a hostile work environment. Although retaliation-based actions by an employer need not be "less objectively offensive than in the context of sex or race," *Boss*, 816 F.3d at 920, the workplace conduct alleged in the First Amended Complaint is sufficiently severe to chill an ordinary employee from blowing the whistle and thus states a claim for relief.

### B.      Section 1983 Claims (Counts II, V, VI, VIII, X, and XII)

The Court shifts to the § 1983 Claims in the First Amended Complaint. Like the Title VII claims, the Defendants move to dismiss all § 1983 claims (II, V, VI, VIII, X, and XII). The Defendants primarily argue that Plaintiff failed to state a § 1983 claim because she did not

(1) sufficiently allege personal involvement of the individual defendants, Billows, Consola, Flores, and Soni, and (2) support her claim for municipal liability under *Monell v. Department of Social Services*, 463 U.S. 658 (1978). With respect to Counts II, V, VI, VIII, X, and XII, the Court will address the Individual Defendants' arguments before turning to the City's arguments, respectively.

### 1.     Individual Defendants

The Individual Defendants seek dismissal of the § 1983 claims against them. The Defendants advance several reasons for dismissal. All four employees maintain that the First Amended Complaint does not allege their personal involvement in the deprivation of Plaintiff's rights. As a backstop, the Individual Defendants largely raise the arguments raised above with respect to the Title VII claims. Specifically, they contend that (i) there is no adverse action to support the race, sex, or age discrimination claims, (ii) there is no indication that the defendants were motivated by a discriminatory animus, and (iii) there is no indication that Plaintiff's whistleblowing caused her discharge. For the reasons already stated, the Court rejects these backstop arguments.

"For constitutional violations under § 1983, 'a government official is only liable for his or her own misconduct.' There is no such thing as *respondeat superior* liability for government officials under § 1983." *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021) (citation and internal quotation marks omitted) (quoting *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015)).

With respect to supervisors, "[t]he supervisor is therefore liable only if she was personally involved in the constitutional violation." *Taylor*, 999 F.3d at 493. As the Seventh Circuit recently explained:

> Personal involvement in a subordinate's constitutional violation requires supervisors to "know about the conduct and facilitate it, approve it, condone it, or

> turn a blind eye for fear of what they might see." Put another way, personal
> involvement in the equal protection context requires specific intent to discriminate.

*Id.* at 494 (citations omitted) (quoting *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)).

In this case, Plaintiff has sufficiently alleged Billows' and Consola's personal involvement in the remaining claims, but not Flores' and Soni's. Regarding Billows, among other allegations, Plaintiff states that "for two years, Charles Billows deliberately and repeatedly ignored Plaintiff, withheld pertinent information from Plaintiff, and denied Plaintiff access to files and information," and later refused to train Plaintiff during the forty-five-day period following her PIP. [24 at ¶¶ 43, 60.] Plaintiff alleges that Consola placed "unreasonable expectations and demands on Plaintiff" [*Id.* at ¶¶ 22, 26–27] and "falsified and embellished reports" including "4,000 erroneously" issued tickets "under Plaintiff's supervision." [*Id.* at ¶¶ 48–49.]

Soni and Flores, who are presumably Billows' and Consola's supervisors, require more to remain in the case. Supervisors "need not have participated directly in the constitutional deprivation, but the allegations must amount to more than vicarious liability for [their supervisees'] unlawful actions." *Taylor*, 999 F.3d at 495. "Personal involvement in a subordinate's constitutional violation requires supervisors to 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" *Id.* at 494 (quoting *Matthews*, 675 F.3d at 708).

Here, Plaintiff has not alleged sufficient facts to state a claim that Soni and Flores may be liable as supervisors. Plaintiff alleges that Flores refused to meet with her, despite her complaints about ongoing discrimination. Her allegations that Flores met with others outside of the protected classes and that "he refused to meet with Plaintiff," [23 at ¶ 59], are insufficient without a more specific allegation that Flores at least knew the subject matter of the complaints and nevertheless

ignored Plaintiff and/or condoned Billows' and Consolas's behavior. Plaintiff does not allege how, at all, Soni "turn[ed] a blind eye" to any supervisees conduct or evinced a "specific intent" to discriminate. See *Taylor*, 999 F.3d at 494–95 (plaintiffs had not satisfied burden to show that supervisors, who had no personal involvement in the supervisees conduct, knew about and disregarded supervisees conduct and therefore "acted on the basis of race").

None of Plaintiff's arguments to the contrary alter the Court's analysis. Plaintiff's sweeping references to "Defendants" in the First Amended Complaint fail to identify Flores and/or Soni's role in issuing and executing the PIP, the denial of training, her termination, and omit how these two Defendants ignored her complaints. [See 23 at ¶¶ 38–42.] That failure to "identify any wrongful act of any particular defendant or defendants related to" the alleged violations is fatal to her § 1983 claims against Flores and Soni. See, *e.g.*, *Harris v. City of Chicago*, 2020 WL 4815907 (N.D. Ill. Aug. 18, 2020) (dismissing individual defendants because plaintiff "does not identify any wrongful act of any particular defendant or defendants related to his [constitutional] claim").

Plaintiff therefore states a claim for relief on Counts II, V, VI, VIII, X, and XII against Defendants Billows and Consola, but Defendants Flores and Soni are dismissed from Counts II, V, VI, VIII, X, and XII of the First Amended Complaint (and therefore the case) without prejudice.

### 2. City Defendant

The City next argues that the Court should dismiss Counts II, V, VI, VIII, X, and XII of the Complaint because Plaintiff has failed to state a claim to hold the municipality liable under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978). Under 42 U.S.C. § 1983, a person may sue anyone who, while acting under color of law, causes him to be deprived of any of his constitutional rights. 42 U.S.C. § 1983; *Connick v. Thompson*, 563 U.S. 51, 60–62 (2011). A municipality can be held liable under § 1983 only "when execution of [its]

21

policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," causes the constitutional deprivation. *Monell*, 536 U.S. at 694. The Seventh Circuit has articulated three avenues to state a claim under *Monell*:

> To establish an official policy or custom, a plaintiff must show that his constitutional injury was caused by (1) the enforcement of an express policy of the [city], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority. Absent proof that the injury in question was caused by an employee with final policymaking authority or by an express policy or established custom of the municipality, there can be no liability on the part of the municipality itself.

*Palka v. City of Chicago*, 662 F.3d 428, 434 (7th Cir. 2011) (alteration in original) (citations omitted) (quoting *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010)). To allege a plausible custom, Plaintiff must show "a 'wide-spread practice' that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (quoting *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995)).

Plaintiff concedes that there is no express policy to support *Monell* liability on any of the claims. However, she asserts that the municipality is liable through the second and third avenues: either because a custom or practice of race-, sex-, age-, and retaliation-based discrimination and harassment caused her deprivations or because the harassment she endured was the result of a decision of a final policymaker. Neither of Plaintiff's theories is adequately pled.

a. ***Monell*: Race Discrimination (Counts II and V)**

Turning first to the race-based *Monell* claims, the City argues that Plaintiff cannot point to a "custom or widespread practice * * * * []supported by specific factual content" to impose liability on the municipality. [29, at 5.] Plaintiff points to several types of allegations to try to support her view that there was a "permanent and well-settled" practice of race discrimination for purposes of

Counts II and V. Those include (1) Plaintiff's own experiences on the job, (2) her allegations that other Black employees received lower pay, (3) her allegation that Black employees were passed over for promotion in favor of non-Black employees, and (4) her allegation that her predecessor, another Black employee, resigned due to discriminatory treatment.[6] The Court agrees that Plaintiff's allegations are insufficient to demonstrate that the City had a practice, custom, and/or policy of discriminating against Black employees for disparate treatment and harassment in the workplace.

To plead a *Monell* claim, Plaintiff must allege "a series of constitutional violations." *Calderone v. City of Chicago*, 979 F.3d 1156, 1164–65 (7th Cir. 2020) (quoting *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)). Isolated events do not plausibly allege a pervasive practice or custom under *Monell*. See *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) ("[T]he plaintiff must demonstrate that the practice is widespread and that the specific violations complained of were not isolated incidents."). Plaintiff's allegations that non-Black employees with the same title and work were paid less than plaintiff and her Black peers [23 at ¶ 22] are not pled with sufficient facts to nudge them across the line from speculation to plausibility. "[B]oilerplate" allegations that repeat the elements of a *Monell* claim without any further factual content are dismissed for failure to state a claim. See, *e.g.*, *Annan v. Village of Romeoville*, 2013 WL 673484, at *6 (N.D. Ill. Feb. 25, 2013) (concluding that an

---

[6] Specifically, as to her personal experience, she alleges that a white employee was promoted over her and several black employees. [23 at ¶ 19.] She alleges that Defendants impeded her job functions over the course of several years. [*Id.* at ¶ 25.] She also alleges she was replaced with a white younger, male. [*Id.* at ¶ 65.] As to other employees, she alleges that the Defendant "has a deliberate and systemic practice of discriminating against Black Women" including that "Plaintiff's predecessor, a Black Woman resigned because of the Defendant's systemic, discriminatory practices" [*Id.* at ¶ 66], that "Defendant promotes inexperienced White males with no education beyond high school over well-qualified, Black women" [*Id.* at ¶ 67], and that non-Black employees with the same title and work were paid less than plaintiff and her Black peers [*Id.* at ¶ 22], for which she filed a complaint [*Id.* at ¶ 23].

allegation that defendant "maintains a policy by which officers use excessive force to arrest individuals with no probable cause or reasonable suspicion warranting such" was insufficient to state a *Monell* claim).

Setting aside the boilerplate allegations, Plaintiff points only to (1) the specific actions of Plaintiff's coworkers against her personally, (2) examples of two White males with less education and/or performance issues receiving promotions, and (3) a single incident involving the Plaintiff's predecessor. These isolated incidents alone, without more specifics to establish a "permanent and well-settled" pattern, *Calhoun v. Ramsey*, 408 F.3d at 380, are insufficient to attach municipal liability. See, *e.g.*, *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) ("[T]hree incidents were too few to indicate that the City had a widespread custom of which City policymakers had reason to be aware.").[7]

As an alternative, Plaintiff attempts the third avenue to *Monell* liability, that her deprivations were caused by a final policymaker. "State or local law determines whether a person has policymaking authority for purposes of § 1983." *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009). Under local law:

> [t]he Chicago City Council is the City's legislative body with the authority to adopt rules regarding employment policy. The City Council has delegated the authority to promulgate personnel rules to the Commissioner of Human Resources. As a result, both the City Council and Commissioner of Human Resources may be considered final policymakers for the City in the area of employment.

---

[7] Plaintiff's custom and practice argument also is not supported by sufficient facts "tending to show that City policymakers were aware of the behavior of the officers, or that the activity was so persistent and widespread that City policymakers should have known about the behavior." *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001). Plaintiff also would need to allege that the widespread practice was the "moving force" behind her deprivation. "Municipalities may be found directly liable only when their own policy or custom is the 'moving force'" behind the deprivation. *Wilson v. Cook County*, 742 F.3d 775, 780 (7th Cir. 2014) (quoting *Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012)). Plaintiff also has not pointed to any allegations that city policymakers knew of and were the moving force behind the widespread custom and practice of race discrimination or harassment.

*Id.* at 581 (internal citations omitted) (citing Chi., Ill. Municipal Code § 2-74-050).

None of the individual agents named in the First Amended Complaint are final policymakers because none is the Commissioner of Human Resources nor are they members of the City Council. Consola is the First Deputy Director [23 at ¶ 6]; Billows is the Deputy Director of Street Operations [*id.* at ¶ 7]; Flores is the Managing Deputy [*id.* at ¶ 8]; and Soni is the City Comptroller. [*Id.* at ¶ 9.] While an executive official may have policymaking authority by express delegation, see *Waters*, 580 F.3d at 581, Plaintiff has not alleged any express delegation of that power. At most, the Plaintiff alleges that Soni, Billows, Consola, and Flores administered, rather than set, personnel policy. See *id.* at 582 ("The authority * * * to *set* policy—i.e., to adopt rules for the conduct of government—distinguishes a 'final policymaker,' whose decisions may subject a municipality to § 1983 liability, from an official who merely possesses 'authority to *implement* pre-existing rules.'") (quoting *Argyropoulos v. City of Alton,* 539 F.3d 724, 740 (7th Cir. 2008)). Plaintiff therefore has not alleged that any final policymaker was involved in the constitutional deprivation.

Having found that Plaintiff has not alleged sufficient facts to state a claim for *Monell* liability through any of the three avenues articulated by the Seventh Circuit, Counts II and V are therefore dismissed against the City without prejudice.

      **b.**    *Monell*: **Age, Sex, and Retaliatory Discrimination (Counts VI, VIII, X, XII)**

The City argues that Counts VI, VIII, X, and XII should be dismissed for failure to allege a widespread custom or practice of gender- and age-based discrimination. The Court agrees. Because Plaintiff neither argues nor cites specific allegations in her brief to support her position that there is a widespread practice or custom of retaliatory, gender, or age discrimination, her claim

fails.  See *Lee*, 912 F.3d at 1053–54; *Duminie*, 2020 WL 1288876, at *5 (plaintiff's cursory argument without pointing to any specific facts constituted grounds for dismissal of the claim).

Furthermore, Plaintiff does not point to any specific facts to support her claim in Count VI that there is a widespread custom of retaliating against employees.  Nor does she point to any facts to support Counts X and XII that the City has a widespread custom or practice of *age* or *sex* discrimination, as distinct from race discrimination.  The isolated events alleged in her First Amended Complaint allege only the following four points: Plaintiff (1) personally incurred age- and sex-discrimination, (2 & 3) examples of promotions of two younger men, one with fewer qualifications and another with performance deficiencies, and (4) her predecessor's resignation. These four instances, though sufficient as grounds to tie her allegations to animus at the pleadings stage, are isolated events that do not amount to a well-settled *pattern* of sex-based discrimination, see *Gable*, 296 F.3d at 538, nor do they suggest that the City was the moving force behind her coworkers' behavior.  Furthermore, as explained above, Plaintiff has not identified any final policymaker that caused these alleged deprivations.  Counts II, V, VI, VIII, X, and XII therefore fail as a matter of law against the City and are dismissed without prejudice.

## IV. Conclusion

For the reasons stated above, the Court grants in part and denies in part Defendants' motions to dismiss [29, 33].

Defendants' motions to dismiss are granted in part as follows:

- All Individual Defendants (Billows, Consola, Flores, and Soni) are dismissed from Counts I, III, IV, VII, IX, and XII;

- Defendants Flores and Soni are dismissed from Counts II, V, VI, VIII, X, and XII as well, and therefore dismissed from the case;

- The City is dismissed from Counts II, V, VI, VIII, X, and XII.

Defendants' motions to dismiss are denied in part as follows:

- Individual Defendants Billows' and Consola's motion to dismiss Counts II, V, VI, VIII, X, and XII is denied;

- The City's motion to dismiss Counts I, III, IV, VII, IX, and XI is denied.

Dated: September 29, 2021

Robert M. Dow, Jr.
United States District Judge