THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VEOLA HANKLE-SAMPLE, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | No. 20 C 1997 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| THE CITY OF CHICAGO, | ) | |
| | ) | |
| Tina Consola, Charles Billows, | ) | |
| | ) | |
| *Defendants*. | | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Veola Hankle-Sample is an African American woman over the age of 40 years who was formerly employed as an Assistant Director in the City of Chicago's Department of Finance, Street Operations Division. She sued her former employer and other individual employees, Defendants City of Chicago, Tina Consola, and Charles Billows for discrimination, harassment, and retaliation under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and 42 U.S.C. § 1983. (Dkt. 23). The Defendants move for summary judgment on all counts. (Dkt. 95). For the following reasons, the motion is granted.

### BACKGROUND

**A. Procedural History**

In July 2020, Veola Hankle-Sample brought this suit against Defendants City of Chicago and four other individual employees alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.*, and 42 U.S.C. § 1983. Hankle claims Defendants engaged in discrimination

1

and harassment on the basis of age, race, and sex, and then retaliated against her for complaining about her treatment. (Dkt. 23).

This matter first proceeded before the Honorable Robert M. Dow. Initially, all Defendants moved to dismiss for failure to state a claim. (Dkt. 29, 33). Judge Dow dismissed Hankle's claims against two defendant-employees, (Dkt. 48), leaving the City, Billows, and Consola as the remaining Defendants. This action was later transferred to this. (Dkt. 81). Hankle alleged disparate treatment under Title VII against the City and under Section 1983 against Billows and Consola for age, race, and sex discrimination (Counts I, II, IX, X, XI, XII); racial harassment under Title VII against the City and under Section 1983 against Billows and Consola (Counts III & V); and retaliation and retaliatory discharge under Title VII against the City and under Section 1983 against Billows and Consola (Counts IV, VI, VII). Defendants now move for summary judgment. (Dkt. 95).

### B. Factual History

The following facts are undisputed unless otherwise noted. The City hired Hankle as a Manager of Revenue Collections in May 2014. (Dkt 114 ¶ 4). She reported to then-Deputy Director Richard Ponce, who in turn reported to then-Managing Deputy Director Tina Consola. (*Id.*). In late 2016, Hankle successfully applied and interviewed for the position of Assistant Director overseeing the Division's parking-enforcement operations. (*Id.* at ¶¶ 6(a)–(g), 7). Consola and then-Deputy Director William Kenan selected Hankle for the role. (*Id.* at ¶ 7). Hankle began her position as Assistant Director in December 2016, with a starting salary of $92,928. (*Id.* at ¶ 8). Hankle's salary was approved and determined by the City's Office of Budget and Management and Department of Human Resources. (Dkt. 114 ¶ 62). Her essential duties included, among other things, analyzing workflow productivity; evaluating staff performance; assisting in development

of internal procedures, guidance, and training for staff; managing vendor relationships; and preparing and analyzing reports on operational activities. (*Id.* at ¶¶ 6(a)–(g)).

Hankle reported to Consola, Kenan, and later Billows (as of February 2017),[1] and Managing Deputy Director Joel Flores (as of August 2017). (*Id.* at ¶ 10; Dkt. 97-8 at 28:7–10). Hankle received assignments primarily from Consola, Kenan, and Flores. (Dkt. 114 ¶ 12). Over the next two and a half years, Hankle's supervisors grew dissatisfied with her performance. (*Id.* at ¶ 23). On August 16, 2019, the City fired Hankle based on her "inability to perform the essential duties of [her] position." (*See id.* at ¶ 23; Dkt. 97-3 at 139). The City highlights five specific instances of Hankle's deficient performance related to her essential duties:

- **911 Parking Complaints Project.** In 2018, Hankle was asked to report the results of parking-enforcement efforts which she oversaw. Flores found the report "completely inaccurate," leading to Flores and Consola meeting with Hankle to discuss the reporting inaccuracies. (Dkt. 114 ¶¶ 24–26).

- **Vendor Management**. Hankle was tasked with managing relations and contract compliance with Serco, one of the City's parking-enforcement vendors. (Dkt 114 ¶ 28). Consola emailed Hankle about a recurring ticketing problem and told her to take corrective action regarding the problem on three occasions. (*Id.* at ¶ 29). One time, Hankle forwarded an email to a parking supervisor regarding a Parking Enforcement Aide's ("PEA") erroneous issuance of tickets to the same vehicle two days in a row. (*Id.* at ¶ 30). This resulted in Consola emailing Hankle that, "[f]orwarding to the supervisor is not ensuring the issue has been taken care of. Please take appropriate ownership of this issue." (Dkt. 97-2 at 150:7–24; Dkt. 114 ¶¶ 29–30). Hankle perceived Consola's email as "harassment." (Dkt. 114 at ¶ 30).

- **Completion of Training Manual.** Hankle was tasked with revising and organizing a training manual for the PEAs as one of her first assignments. (*Id.* at ¶ 47). In June and July 2018, Consola sent Hankle multiple emails addressing, among other perceived issues with the training manual, Hankle's failure to follow training manuals' usual format, missing information, inaccuracies, and failures to list critical instructions and municipal code sections. (*Id.* at ¶¶ 47, 49–50). The parties dispute whether the training manual was ultimately completed before Hankle's termination. (Dkt. 126 ¶ 115).

---

[1] The parties disagree as to whether Charles Billow's title was "Director of Security" or "Assistant Director." The Court finds his precise title immaterial, as on an organizational chart Hankle reported to Billows and Billows identified that Hankle reported to him. (Dkt. 114 ¶ 11; Dkt. 97-8 at 28:7–10).

3

- **FOIA Request.** On March 16, 2018, Kenan assigned Hankle to gather documents in response to a FOIA request seeking all tickets written by a particular PEA on a certain day, area, beat number, and geographic assignment. (Dkt. 114 ¶ 51). Consola told Hankle that her production was incomplete, to which Hankle responded that she had not been formally trained in how to respond to a FOIA request. Hankle perceived Consola's email as "harassment." (*Id.* at ¶ 53).

- **Equitable Enforcement.** In 2019, Flores assigned Hankle with preparing a weekly spreadsheet to monitor PEA assignment and enforcement. (Dkt. 114 ¶ 40). Flores found the first weekly report "grossly inaccurate" and later met with Hankle to explain how to properly analyze the data. (*Id.* at ¶¶ 41–42). This issue did not resolve. (*Id.* at ¶ 46). Hankle does not dispute the reports were inaccurate but attributes the inaccuracies to the City's software vendor. (*Id.* at ¶ 44).

On March 1, 2019, Kenan gave Hankle a low performance evaluation and placed her on a performance improvement plan ("PIP"). (*Id.* at ¶ 54). The PIP identified several performance gaps, including in the following responsibilities: (a) implementing updates to the training manual and training PEAs and employees of the City's parking enforcement vendor; (b) performing regular field monitoring of staff and providing weekly reports; (c) implementing a monthly audit process to ensure equitable enforcement validated by GPS, ticketing data and zone assignments; (d) managing Serco to ensure accurate billing and quality of ticket issuance; (e) analyzing ticket issuance and productivity reports to conform to enforcement of City's enforcement strategy; (f) covering for absent PEA supervisors and the manager of parking; (g) monitoring staff performance and issuing discipline consistently and equitably; and (h) ensuring new staff are onboarded, trained, and evaluated during their probationary period. (Dkt. 114 ¶ 55; Dkt 97-3 at 131–133). Kenan and Hankle met twice during the 45-day period of her PIP, and on May 30, 2019, Kenan evaluated Hankle's progress, finding little improvement. (Dkt. 114 ¶¶ 56–57). Billows had no role in evaluating Hankle's performance or the decision to place Hankle on a PIP. (*Id.* at ¶ 59). Finally, on August 5, 2019, Flores recommended that Hankle be discharged for failure to perform essential job duties, and the City fired Hankle eleven days later. (*Id.* at ¶ 58; Dkt. 97-3 at 139).

4

    a. **Hankle's Perceived Discrimination and Complaints**

In Hankle's view, Consola's reprimanding emails were harassing, and "unfair" to be sent to her within the Street Operations Division. (Dkt. 97-2 at 214:8–15, 215:1–216:7). And Hankle complains that Billows refused to communicate, interact with, or train her. (*See, e.g.*, Dkt. 114 ¶¶ 30, 85). Kenan, Flores, Billows, and Consola did not make any comments reflecting discriminatory animus based on race, age, or gender. (Dkt. 114 ¶¶ 13–15, 17). Further, Hankle states she did not believe that Kenan, Flores, or Consola harbored any discriminatory animus. (*Id.*; Dkt. 97-2 at 60:20–61:3; 82:13–15; 90:1216).

Yet, Hankle believes that Billows harbored race- and gender-based animus. (Dkt. 114 ¶ 18). Hankle bases this belief on: (1) Billows's lack of "interaction with [her]" and lack of "direction," "training," and "communication"; and (2) Billows's perceived better treatment of another employee in her division, Anthony Gambino, who is a white male. (Dkt. 97-2 at 64:16–24). Gambino, a Director of Administration, was on Hankle's level according to an organizational chart, and like Hankle, he reported to Billows. (Dkt. 97-3 at 100). Unlike Hankle, Gambino held a career-service position, subject to different rules and disciplinary procedures than non-career-service employees. (Dkt. 114 ¶ 20; Dkt. 126 ¶ 92). Gambino was not placed on a PIP nor terminated. (Dkt. 126 ¶ 117). The parties dispute whether Gambino was given the same assignment as Hankle of creating a training manual. (Dkt. 126 ¶ 116).

Throughout her employment at the City, Hankle brought internal and external equal employment claims. In March 2018, September 2018, and January 2019 Hankle complained to the City's Equal Employment Office ("EEO Office") that she was subject to "harassment" based on Consola's emails (1) providing criticism of Hankle's response to the FOIA request, (2) needing for "ownership" of the PEA's repeated issuance of the wrong type of parking ticket, and (3) assigning

5

multiple PEAs to a single zone. (Dkt. 114 ¶¶ 63–65). In July 2018, Hankle also complained to the City's EEO Office about being paid less than other, non-African American Assistant Directors in other divisions within the Department of Finance, (Dkt. 97-2 at 238:17–23); Dkt. 114, ¶ 61), and to Human Resources, though Hankle the record does not contain evidence on the full title, salary, responsibilities, age, length of time in their positions, division, age, or ethnicity of those employees. (Dkt. 126 ¶ 112; Dkt. 114 ¶ 62; Dkt. 97-2 at 49:10–53:23).

On September 7, 2018, Hankle filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging race, age, and gender discrimination and retaliation. (Dkt. 114 ¶ 67). On June 6, 2019, Hankle filed an amended charge due to Billows's failure to train, communicate, or provide necessary support, as well as harassment from upper management. (Dkt. 97-3 at 157, 159; Dkt. 114, ¶ 68). Sometime after her August 16, 2019, termination, Hankle filed by phone a second amended charge of discrimination alleging her termination was retaliatory. (Dkt. 114 ¶ 69). The EEOC issued Hankle a right-to-sue letter on January 22, 2020, and Hankle filed this lawsuit on March 26, 2020. (Dkt 1; Dkt. 114 ¶ 70).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Med. Protective Co. of Fort Wayne v. Am. Int'l Specialty Lines Ins. Co.*, 990 F.3d 1003, 1008 (7th Cir. 2021). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). "A genuine issue of material fact exists only if 'there is sufficient evidence'" for a jury to return a verdict for the nonmoving party. *BirchRea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "Speculation is not sufficient

6

to survive summary judgment; there must be evidence." *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 573 (7th Cir. 2021) (cleaned up and internal citations omitted).

## DISCUSSION

### I. Administrative Exhaustion

First, Defendants argue that Hankle did not exhaust her administrative remedies when her EEOC charges did not reference an alleged pay disparity or retaliatory discharge. Judge Dow found the administrative exhaustion review premature at the motion to dismiss stage due to an "information gap" regarding whether Hankle formally submitted an updated September 2019 EEOC charge alleging retaliatory discharge. (*See* Dkt. 48 at 13–14). An EEOC charge encompasses the claims in a complaint "if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019); *Cheek v. W & S Life Ins. Co.*, 31 F.3d 487, 500 (7th Cir. 1994). Hankle's June 2019 charge sufficiently encompasses her complaints related to race, age, gender, retaliation, and harassment. Hankle checked the boxes for sex, race, age, and retaliation, notes "harassment," listed her repeated "complain[ts]," and alleged her "different terms and conditions of employment," for which compensation and termination are one. (Dkt. 97-3 at 157–159). However, to the extent that there still exists an information gap and dispute whether Hankle properly filed her updated September 2019 EEOC charge, the Court finds it as irrelevant in light of its decision dismissing Hankle's claims in full.

### II. Disparate Treatment (Counts I, II, IX, X, XI, XII)

Because Hankle's race, age, and sex discrimination claims arise from the same set of facts, the Court will address them together. Title VII prohibits an employer from "discharg[ing] any

7

individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Courts in this Circuit assess Title VII claims (as well as Section 1983 claims) as if they would "permit a reasonable 'factfinder to conclude that the plaintiff's race, ethnicity, sex . . . or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019).

In cases such as this one, where there is no evidence of race, age, or gender animus by any of the Defendants, the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) provides one familiar method for analyzing a Title VII discrimination claim. *Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 606 (7th Cir. 2022). Under *McDonnell Douglas*, a plaintiff first establishes a prima facie discrimination claim by showing that "(1) she is a member of a protected class, (2) she was meeting the employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Id.* (quoting *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016)). Once the plaintiff makes her prima facie case, "the burden shift[s] to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (quoting *Simpson*, 827 F.3d at 661) (internal quotations omitted).

The *McDonnell Douglas* framework, though, is just a means to an end. The key—and increasingly favored—question "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or adverse employment action." *Ortiz*, 834 F.3d at 765; *see also Abebe*, 35

8

F.4th at 606. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Khungar*, 985 F.3d at 573 (quoting *Ortiz*, 834 F.3d at 765). And in cases where "the issue of satisfactory job performance . . . lies at the heart of th[e] dispute [and] must be analyzed in detail at [multiple] stages of the *McDonnell Douglas* test," it is "simpler to run through that analysis only once." *Khungar*, 985 F.3d at 573–74 (quoting *Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002)).

This is such a case; the dispute centers on Hankle's job performance. At issue is whether Defendants unreasonably expected Hankle to perform essential job functions and whether her inability to do so was based on Defendants' failure to communicate, train, or direct her based on her age, race, and gender. Taken as a whole, the evidence supports only one conclusion: the City placed Hankle on a PIP and fired her because of her documented poor job performance, not because of Hankle's race, age, or gender. In other words, Hankle has not produced sufficient evidence to support a jury finding that the City placed her on a PIP and, ultimately, terminated her because of her race, age, or gender.

Here, the Defendants presented extensive evidence that Hankle failed to meet the City's legitimate expectations over the period of her employment, both before and after putting her on the PIP. Hankle does not dispute that her supervisors were dissatisfied with her performance, but she asserts that it was "unfair" to be held responsible for tasks that she wasn't trained or put on notice of. (Dkt 97-2 at 214:3–15). This argument misses the mark: as documented in the record, Hankle's failings were not based on her need for complicated trainings or the need to be in specific meetings, but were rather based on inaccuracies, untimeliness, communication, attention to detail, and ownership over projects. Hankle was not held to different standards based on her protected traits; these are skills that it is reasonable for the City to expect an employee, especially one with

9

a title of Assistant Director, to hold. Hankle disputes that there was "deficient performance," (without providing any other evidence to the contrary. (Dkt. 114 ¶ 23).

Hankle states that Billows withheld instructions and trainings based on her race and gender, which led to her poor performance. (*See* Dkt. 114 ¶ 85). But the City raises five specific instances of Hankle's failure to meet legitimate expectations of her essential job duties, some of which do not implicate Billows and were tasks within Hankle's control. For example, it is undisputed that no information was withheld from Hankle in the preparation of the training manual, (Dkt. 114 ¶50), and Hankle did not need any information or training to perform the other areas cited in her PIP, (Dkt. 114 ¶ 76).

Further, Hankle cites to emails from Consola, her performance evaluation, and PIP, attempting to show that she was picked on and singled out for failings in the Street Operations Division. It is clear that Hankle disagreed with Consola's evaluations and characterizations of her work. But she offers no evidence that these critiques—whether accurate or not—were a pretext for discrimination. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957–58 (7th Cir. 2021) ("[T]he question is not whether the ratings were *right* but whether the employer's description of its reasons is *honest*." (quoting *Gustovich v. AT&T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) (per curiam))). Mere disagreement with a supervisor's performance evaluations does not establish pretext. *See Abebe*, 35 F.4th at 607 (affirming summary judgment where plaintiff disagreed with supervisor's assessment of her communication skills but offered no contrary evidence). Though Hankle points to the fact that she believes her supervisors within the Street Operations Division were not subject to Consola's dissatisfaction with certain tasks, her argument that she "was the only one placed on a [PIP]" in her division is insufficient to create a genuine issue of fact. (Dkt. 113 at 6; *LaRiviere.*, 926 F.3d at 360 (finding an employee cannot create a

10

genuine issue by arguing that "there is no evidence in this case anyone else was terminated at this time but [me]")).

Though an analysis under *Ortiz* is sufficient on its own, the Court notes that Hankle's claim also fails under the full *McDonnell Douglas* framework. Hankle is (1) unable to identify similarly situated employees who were members of an unprotected class that (2) were treated more favorably. Hankle points to Anthony Gambino, a Director of Administration II who also reported to Billows, as an employee who was not terminated nor given a PIP. However, Hankle provides evidence in generic terms that Billows interacted with Gambino over her and that Gambino also failed to complete a task concerning a manual and was not disciplined. (Dkt. 126 ¶ 116). It is insufficient to show that Gambino received one similar assignment and reported to the same individual to show that show that Gambino is sufficiently comparable to Hankle "in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002); *Alvares v. Bd. of Educ. of City of Chicago*, No. 18 CV 5201, 2021 WL 1853220, at *10 (N.D. Ill. May 10, 2021) (general statements that an employee was investigated or disciplined, while others were not "do not suffice"). To evaluate whether Gambino is similarly situated, there must be similarities for example with respect to his job description, supervisor, and comparable experience, education, and other qualifications. *Patterson*, 281 F.3d at 680. The parties do not point to these facts and Hankle did not "even know very well" what Gambino did or his exact position. (Dkt. 97-2 at 66:11–15). In light of this, to the extent it is relevant, the Court does not find that Hankle satisfied the fourth prong of *McDonnell Douglas*.

In short, no rational connection exists between the critiques of Hankle's job performance and her contention that Consola and Billows were motivated by discriminatory animus against her. The evidence likewise shows that after enacting the PIP, Hankle's supervisors remained unsatisfied

with her performance. While Hankle again disagrees with the assessments, there is no evidence to show they were pretextual. *See Igasaki*, 988 F.3d at 957–58; *Abebe*, 35 F.4th at 607; *Alvares*, No. 18 CV 5201 at *10 (finding employee did not point to any evidence in the record that undermined the accuracy of her negative teacher ratings or her PIP citation); *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012).

Viewed as a whole, the evidence shows a documented, downward-trending job performance resulting in Hankle's termination. Hankle's supervisors' opinions of her work did not improve during and after the PIP period, so the City terminated her. In the face of such evidence, three arguably harsh emails from Consola and general statements that one of her direct supervisors did not interact or train her with no clear connection to Hankle's age, race, or gender cannot support an inference that the City took its actions for discriminatory rather than legitimate reasons. *See Ortiz*, 834 F.3d at 765. Thus, Hankle's discrimination claims fail.

### III.  Racial Harassment (Count III & V)

To survive summary judgment on a hostile work environment claim, Hankle must provide evidence that: (1) she was subjected to unwelcome conduct; (2) the conduct was directed at her because of her race; (3) the conduct was severe or pervasive enough to create a hostile work environment; and (4) there is a basis for employer liability. *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019) (quotations omitted). While "a workplace need not be hellish to constitute a hostile work environment, a hostile work environment must be so pervaded by discrimination that the terms and conditions of employment are altered." *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (cleaned up). Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 549 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Hankle alleges she faced a hostile work environment based on racial harassment from Consola and Billows. Yet, no reasonable jury could find that Hankle was subject to a hostile work environment. Hankle uses the same facts as her discrimination claims to support her hostile work environment claim. Based on those facts, at most, the record suggests that two of Hankle's supervisors were demanding, blunt, or gave Hankle the cold shoulder. In the case of Consola, her emails could be characterized as having an aggressive tone. (*E.g.*, "[a]ccuracy and completeness is not something you can be trained on," Dkt. 97-3 at 103)). But Hankle acknowledges that Consola's March 2018 email "wasn't probably based on . . . race." (Dkt. 97-2 at 144:7, 145:9–14). Further Hankle's statements that Billows was "repeatedly ignoring her" and "excluding her," without more details as to how this conduct created a pattern of harassment so "severe or pervasive" that it "altered the conditions of employment" is insufficient. *Gates*, 916 F.3d at 636; s*ee Beaulieu v*, 2021 WL 4502163, at *7 (finding "blunt, uncharitable, and rude" supervisory style not a hostile work environment). Moreover, there is no indication in the record that these events were related to Hankle's race. So Hankle's racial harassment claim fails.

## IV. Retaliation (Counts IV, VI, VII, and VIII)

Finally, under Title VII, it is unlawful "for an employer to discriminate against any of [its] employees . . . because [she] has opposed . . . an unlawful employment practice . . . ." 42 U.S.C. § 2000e-3(a). "To survive summary judgment on a Title VII retaliation claim, an employee 'must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [defendant] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th

Cir. 2018) (quoting *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017)).

For the second prong, a materially adverse action must be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007). Yet, for claims of retaliation, "the range of conduct prohibited . . . is broader than Title VII's [anti-]discrimination provision." *Id.* at 654 (internal citation omitted). Still, the challenged action "must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Id.* at 655. Adverse actions do not include acts that are no more "than a mere inconvenience or an alteration of job responsibilities." *Atanus*, 520 F.3d at 677–78 (citation omitted). Third, "[t]o show causation, employees may point to circumstantial evidence, such as suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Khungar*, 985 F.3d at 578. Overall, the Court "consider[s] the evidence as a whole and conduct[s] a 'straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [materially adverse action]?'" *Id.* (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)); *see also Ortiz*, 834 F.3d at 765.

For Hankle's retaliatory discharge claims, as discussed above Hankle fails to create a genuine issue that her termination was predicated upon retaliation. For her remaining retaliation claims, Hankle fails to show that her complaints constitute materially adverse actions against her and that there is causation between her protected activity and the action. First, it is not clear that

14

Hankle suffered a materially adverse action outside of her termination. Hankle complains that her retaliation included being "denied access to software," and "excluded from meetings." (Dkt. 113 at 8; Dkt. 126 ¶¶ 85–89). Outside of her termination, these actions do not rise to the level of a "materially adverse employment action" such as impacting her "work conditions or prospects [that] impact[] future wealth" or "humiliating, degrading, unsafe, unhealth, or otherwise significantly negative alterations in her workplace environment." *Alamo*, 864 F.3d at 552. They rather appear as a "inconvenience" that do not explain all of Hankle's job performance issues. *Atanus*, 520 F.3d at 677–78. The record does not show that Hankle was "denied" access to software, just that she did not have access to certain software until March 5, 2019. And Hankle did not rebut that the denial of software or trainings, even if it occurred for a period of time, was in relation to her internal and external complaints.

Second, Hankle provides no direct causal link between her EEO and EEOC complaints and the purported actions taken by Defendants. Hankle's complaints with the City's EEO Office were made between March 2018 and March 2019, and her EEOC complaints were filed in September 2018 and June 2019. She was placed on a PIP almost one year after her internal EEO complaint and seven months after her EEOC complaint. Here, the timing between Hankle's purported protected activity and the PIP and termination is not suspicious. The length of time that passed between the complaints and the purported retaliation belies a causal connection between the two events, especially in light of the Hankle's documented performance issues. *LaRiviere*, 926 F.3d at 360–61; *see also, e.g.*, *Igasaki*, 2018 WL 4699791, at *8 (finding suspicious timing insufficient to demonstrate causation, especially with ample evidence of employee's "deficient performance"). Further, the City's evidence showing Hankle failed to meet its legitimate performance expectations rebuts the presumption that their actions were taken in retaliation for Hankle's complaints. *See*

*Boss v. Castro*, 816, F.3d 910, 919 (7th Cir. 2016) ("In other words, [employee] was put on a PIP because his performance needed improving.").

Even viewing Hankle's 2019 complaints as connected to her purported denial of software and training by Billows from January through March 2019, Hankle is not able to create a genuine dispute that Billows (or Consola) knew about her internal and external complaints and took any of his actions because of them. The parties dispute whether Defendants knew about Hankle's internal and external EEO complaints during this time period. Hankle provides testimony from Doniece Stevens, an Assistant Director in Personnel, that in her perception "once they were aware of the [EEO complaint] that's when it turned into a matter of termination." (Dkt. 114-1 at 43:18–22). This third party speculation is weak in light of the Hankle's own statements that she did not know if Stevens told Consola or Billows about the complaints, but she "just fe[lt] as if … [Consola] knew" because "they talk a lot." (Dkt 97-2 at 254:9–255:24). Further, Consola and Billows both stated that that they did not know about Hankle's complaints until this action was filed (Dkt 97-8 at 39:6-19, 36:20–37:5). Without Billows and Consola's knowledge of the complaints, their actions could not be in retaliation.

In speaking up about perceived "discrimination," Hankle failed to connect what she felt as unfair criticism and lack of attention from her supervisors with her age, race, or gender. And no connection can be reasonably inferred from the context. Viewed as a whole, the evidence cannot support a conclusion that Defendants took their actions in retaliation against Hankle for complaining about perceived discrimination by her supervisors. *See Ortiz*, 834 F.3d at 765. Thus, Hankle's retaliation claim fails.

## CONCLUSION

For these reasons, the Court grants Defendant City of Chicago's Motion for Summary Judgment. [95]

_____
Virginia M. Kendall
United States District Judge

Date: September 30, 2023